**RENAISSANCE CENTER VENTURE, a Michigan co-partnership, Plaintiff/Counter–Defendant,**

**v.**

**Alex LOZOVOJ, Renaissance Office Machines, Inc., a Michigan corporation, and Christine Klauss, jointly and severally, Defendants/Counter–Plaintiffs,**

**and**

**Alex LOZOVOJ (and all others similarly situated), Third–Party Plaintiffs,**

**v.**

**Stephen A. HORN, Jeffrey M. Sangster, William J. Moylan, Howard Weinstein, Paul Beitz, and Current Chief Financial Officer of Renaissance Center Management Company, individually, and Exact Products, Inc., Thace Associates, The**

---

Travelers Insurance Company, John Hancock Mutual Life Insurance Company, Aetna Life Insurance Company, Ford Motor Credit Company, The Equitable Life Assurance Society of the United States, Renaissance Center Partnership, Rubloff, Inc., and its successor Koll/Rubloff, Renaissance Center Management Co., Moylan Engineering Associates, Inc., Harold H. Swenson, C.P.A., P.C./Harold H. Swenson, C.P.A., Lowe Enterprises, Inc., Laura Moylan, Robert Scott, Jack Emery, Kotz, Sangster, McInerney and Wysocki, P.C., and John/Jane Does and Doe Entities/Corporations, jointly and severally, Third–Party Defendants.

QUALITY LIFESTYLES, INC. (and all other similarly situated—a class action), Plaintiffs,

v.

RENAISSANCE CENTER VENTURE, a Michigan co-partnership, Thace Associates, The Travelers Insurance Company, John Hancock Mutual Life Insurance, Ford Motor Credit Company, The Equitable Life Assurance Society of the United States, Renaissance Center Partnership, Rubloff, Inc., Renaissance Center Management Co., Moylan Engineering Associates, Inc., Harold H. Swenson, C.P.A., P.C./Harold H. Swenson, C.P.A., Carol A. Sigler, C.P.A., and Sigler & Swenson, P.C., jointly and severally, Defendants.

Nos. 94–CV–74485–DT, 94–CV–74841–DT and 93–CV–72629–DT.

United States District Court, E.D. Michigan, Southern Division.

May 5, 1995.

Jeffrey M. Sangster, Mark R. Gilling, Kotz, Sangster, Detroit, MI, for Renaissance Center Venture.

John M. Rickel, Rickel & Baun, Grosse Pointe Farms, MI, for Alex Lozovoj, Renaissance Office Machines, Inc., and Christine Klauss.

Jeffrey M. Sangster, Frederick A. Berg, John T. Below, Kotz, Sangster, Detroit, MI, for Stephen A. Horn, Jeffrey M. Sangster, William J. Moylan, Howard Weinstein, Paul Beitz, Exact Products, Inc., Rubloff, Inc., Koll/Rubloff, Renaissance Center Management Co., Lowe Enterprises, Inc., Jack Emery, Kotz, Sangster, McInerney and Wysock, Professional Corp.

· Alan M. Greene, Dykema Gossett, Detroit, MI, for Trace Associates.

Alan M. Greene, Cheryl A. Fletcher, Dykema Gossett, Detroit, MI, for Travelers Ins. Co.

Alan M. Greene, Cheryl A. Fletcher, Detroit, MI, for John Hancock Mut. Life Ins. Co., Aetna Life Ins. Co., Ford Motor Credit Co., Equitable Life Ass. Soc. of the U.S., Renaissance Center Partnership, and Robert Scott.

Stephen M. Landau, Southfield, MI, for Harold H. Swenson, C.P.A., Harold H. Swenson, C.P.A., P.C./Harold H. Swenson, C.P.A., Carol A. Sigler, C.P.A., P.C./Carol A. Sigler, C.P.A., Sigler and Swenson, P.C.

Laurence M. Scoville, Jr., Thomas M. Dixon, Clark, Klein, Detroit, MI, for Coopers and Lybrand C.P.A.

## ORDER GRANTING RICO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AS TO RICO CLAIMS ONLY AND DISMISSING SUPPLEMENTAL STATE LAW CLAIMS

HACKETT, District Judge.

These lawsuits arise out of a contractual dispute as to how electric usage should be metered for tenants at the Detroit, Michigan office complex known as the Renaissance Center. The only basis for federal jurisdiction are plaintiffs'/counter-plaintiffs'/third-party plaintiffs' RICO claims. Because there is no legal or factual support for the RICO claims, summary judgment shall be granted in favor of defendants/counter-defendants/third-party defendants as to those claims. In addition, the court shall decline to exercise jurisdiction over the supplemental state law claims.

### BACKGROUND

#### A. *Procedural History*

These three related lawsuits arise out of the same facts. For purposes of this order, the court will focus on the federal claims only. All three actions arise out of claims by Renaissance Center office tenants that their electric usage was improperly metered causing them to be overbilled. The office tenants in the lawsuit each rented partial floor space at the Renaissance Center. None of the office tenants in the lawsuit rented an entire floor of the building. The partial floor tenants assert that they were overbilled because Renaissance Center had meters on each floor, as opposed to meters for each office, and bills are calculated based on the percentage of floor space that each tenant occupies.

The first lawsuit, *Quality*, No. 93–CV–72629–DT, was filed by plaintiff Quality Lifestyles, Inc. (Quality) on January 6, 1993. Quality is a former partial office tenant at the Renaissance Center. Quality purports to represent a class of partial office floor tenants but no class certification has been granted.

Defendants in the first of the three related lawsuits are: the owner of the Renaissance Center office complex, Renaissance Center Venture (RCV); and its partners Renaissance Center Partnership (RCP) and THACE. The underlying partners of THACE are defendants Travelers Insurance Company, John Hancock Insurance Company, Aetna Insurance Company, Ford Motor Credit Company, Equitable Insurance Company. The remaining defendants are the property manager of the Renaissance Center Rubloff, Inc., and its wholly owned subsidiary Renaissance Center Management Co. (RCMC), and accounting firms Sigler & Swenson and Coopers & Lybrand, accountants Harold Swenson and Carol Sigler, and Moylan Engineering Associates, Inc. (Moylan) which prepared monthly invoices for electric power quantities calculated at electric rates charged to and collected from RCV tenants.

The two companion cases bearing the same caption, *RCV*, No. 94–CV–74485–DT and *RCV*, No. 94–CV–74841–DT arise out of the same lawsuit filed by RCV for back rent in Wayne County Circuit Court against former Renaissance Center office tenant Renaissance Office Machines, Inc. (ROM), a now defunct corporation, and its shareholders Alex Lozovoj and Christine Klauss. Defendants ROM and Lozovoj filed a counter-claim against plaintiff RCV alleging violations of RICO, 18 U.S.C. §§ 1962(b) and (c) allegedly arising out of electric rate overcharges. Defendants ROM and Lozovoj also filed a third-party complaint alleging the same electric rate overcharges pursuant to RICO against certain third-party defendants, most of whom are the same defendants named in the original *Quality* action assigned to this court. Not all third-party defendants have been named as defendants in the RICO counts filed by Lozovoj and ROM. The third-party

defendants named in the RICO counts are: THACE, The Travelers, John Hancock, Aetna, Ford Motor Credit, The Equitable, RCP, Rubloff, Inc. and its successor Koll/Rubloff, Inc., RCMC, Stephen Horn, Jeffrey Sangster, Moylan Engineering Associates, William Moylan, and Paul Beitz. Plaintiffs Lozovoj and ROM in the counter and third-party complaint purport to represent a class of office tenants, but again, no class certification has been granted at this time.

## B. *Removal*

■ In case No. 94–CV–74485–DT, defendants Lozovoj and ROM filed a notice of removal in federal court alleging that jurisdiction existed based on the federal RICO claims which they themselves had pled as counter-plaintiffs/third-party plaintiffs. Such removal was clearly improper as defendants may remove only on the basis of claims brought against them and not on the basis of counterclaims asserted by them. *Coding Products, Inc. v. Homco Int'l, Inc.*, No. 94–CV–143, 1994 U.S.Dist. LEXIS 19046 (W.D.Mich. Dec. 2, 1994); *Dixie Elec. Co-op. v. Citizens of Alabama*, 789 F.2d 852 (11th Cir.1986). 14A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Jurisdiction 2d* § 3731 (1985). That improper notice of removal was assigned to Judge Edmunds.

Recognizing that defendants could not remove based upon their own counter-claims, third-party defendants THACE Associates and its underlying partners and RCP filed a notice of removal. That notice of removal was docketed as a new case, notwithstanding the fact that the same case had already been improvidently removed to this court by defendants and assigned to Judge Edmunds. The second notice of removal was docketed as No. 94–CV–74841–DT and assigned to Judge Gilmore. Both *RCV* cases were then reassigned to this court, as companions to *Quality*.

■ The next issue for the court to address is whether third-party defendants were the proper parties to remove this action. There is a clear split among the Circuits that

have addressed the issue of a third-party defendant's ability to remove a case filed in state court. *Compare Thomas v. Shelton*, 740 F.2d 478 (7th Cir.1984), *petition for cert. filed*, (Mar. 1, 1995) (third-party defendant barred from removal), *with Carl Heck Engineers, Inc. v. Lafourche Parish Police Jury*, 622 F.2d 133, 135–36 (5th Cir.1980) (third-party defendant may remove).[1] The Sixth Circuit has not addressed the issue. *See Garner v. MIC Gen. Ins. Corp.*, 869 F.Supp. 497 (E.D.Mich.1994).

In *Thomas*, the Seventh Circuit disallowed third-party defendant removal where the third-party complaint was dependent on the underlying claim. 740 F.2d at 488. Although the Seventh Circuit did not state a general prohibition against all removals by third-party defendants, the court's opinion implied that such removals are never, or only in extremely rare circumstances, appropriate. *Id.* at 488. In his dissenting opinion, Judge Swygert agreed with the majority's holding but challenged the majority's "strong inference if not the direct holding that third-party defendants can never remove under 28 U.S.C. § 1441(c)," explaining that there is no reason why a third-party defendant dragged involuntarily into court is not a defendant within the meaning of the removal statute. *Id.* at 490. The dissenting view is more persuasive.

■ In fact, many courts have approved of third-party defendant removal where the third-party complaint states a "separate and independent claim which if sued upon alone could have been brought properly in federal court." *Heck*, 622 F.2d at 136. *See e.g. Oklahoma Bankers Ass'n v. Home Sav. & Loan Ass'n*, 625 F.Supp. 993 (W.D.Okla. 1984), *Soper v. Kahn*, 568 F.Supp. 398, 400–01 (D.Md.1983) (and cases cited therein), *Southland Corp. v. Estridge*, 456 F.Supp. 1296 (C.D.Cal.1978). These cases present a more rational approach to the issue. As the Fifth Circuit explained in *Heck*, "the language of the [removal] statute does not require only those causes of action joined by the original plaintiff to form the basis of

---

1. *See* Walter W. Jones, Jr., Annotation, *Right of Third–Party Defendant to Removal of Action From* State to Federal Court Under 28 U.S.C. § 1441, 8 A.L.R.Fed. 708 (1971 & Supp.1994).

removal." 622 F.2d at 136. Third-party defendants, like other defendants that have not chosen to be in state court, should be and are allowed to remove separate and independent claims.

The question before this court then is whether the third-party RICO complaint states a "separate and independent claim." Clearly, the third-party RICO complaint does state an independent claim which stands alone and is not conditioned upon the underlying claim for back rent. Unlike an indemnity action which courts have repeatedly found does not state an independent claim, the RICO complaint is not at all contingent upon a finding of liability on the main claim. The RICO claim could have been brought in a suit separate from the one filed by the original plaintiffs. Because the RICO claims stated in the third-party complaint are unequivocally separate and independent from the underlying back rent claim, third-party defendants properly removed the lawsuit.

For purposes of this order, the court shall only address the *RCV* action which third-party defendants removed, No. 94–CV–74841. The *RCV* action which defendants improperly removed, No. 94–CV–74485, shall be dismissed.[2]

### C. Underlying Complaints

In the *Quality* action, plaintiff's third amended complaint alleges the following claims: (1) breach of lease arising out of utility charges, (2) breach of lease arising out of Michigan state tax and Detroit utility users tax, (3) common law fraud, (4) negligent misrepresentation, (5) violations of RICO pursuant to 18 U.S.C. § 1962(c), and (6) violations of RICO pursuant to 18 U.S.C. § 1962(b).

In the *RCV* action, counter/third-party plaintiffs have brought a nine-count complaint[3] alleging the following claims: (1) breach of real estate lease arising out of utility charges, (2) breach of real estate lease

arising out of Michigan State tax and Detroit utility users tax, (3) common law fraud, (4) negligent misrepresentation, (5) violations of RICO pursuant to 18 U.S.C. § 1962(c), (6) violations of RICO pursuant to 18 U.S.C. § 1962(b), (7) breach of fiduciary duty, (8) tortious interference with lease agreement, and (9) violations of the Michigan Consumer Protection Act, (10) credit defamation, (11) abuse of process, and (12) malpractice.

For purposes of this order and for ease of reference, the court shall refer to plaintiffs in the *Quality* action and to counter-plaintiffs/third-party plaintiffs in the *RCV* action as the RICO plaintiffs. Similarly, the court shall refer to defendants in the *Quality* action and to counter-defendants/third-party defendants in the *RCV* action as the RICO defendants.

### D. Jurisdiction

In both cases, jurisdiction is based upon the federal question presented in the RICO counts only pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331. The supplemental state law claims are brought pursuant to 28 U.S.C. § 1367.

### E. Electric Metering

RCV furnishes its office tenants with electricity. When the Renaissance Center was first built, each office tower was served by only one meter and electricity to individual tenants was allocated by an outside engineering consultant. The metering methods about which the RICO plaintiffs complain were instituted in the early 1980s when separate floor meters were installed. With the advice and assistance of engineering consultants Moylan, the office towers were wired in the early 1980s so that meters could be installed to measure electric usage on each floor. As a result, each floor of the Renaissance Center is now serviced by three meters, two low voltage and one high voltage. The high voltage meter services all common areas, includ-

---

**2.** Remand would not be appropriate as the same case was later properly removed and is now pending before this court.

**3.** In the *RCV* case, counter/third-party plaintiffs have filed several proposed amended complaints

but no leave to file such complaints has been granted by this court. Thus, the court addresses the first amended counter and third-party complaint which was removed to this court from Wayne County Circuit Court.

ing the elevator bay and bathrooms, and is primarily for overhead lighting. Low voltage meters are shared among partial floor tenants according to a determined percentage of use by each tenant.

The meters are read monthly by Moylan. Moylan allocates the electrical charges among tenants sharing one or more meters based upon square footage allocations. In addition, Moylan spot checks the accuracy of the allocations at various times, and inspects and certifies the accuracy of the meters on an annual basis. Electrical statements are prepared by defendant Moylan each month and those statements identify the number of tenants using each meter and the percentage of electricity which is being charged to the tenant. This metering system was in effect before RCV and THACE became owners of the Renaissance Center.

### F. RCV's Contract with Edison

RCV supplies electricity to its tenants according to its 1975 contract with Edison. Pursuant to the terms of that contract, RCV purchases a specified minimum amount of electricity from Edison at a primary rate which is lower than the general service rate, or secondary rate, that an average consumer pays for electricity purchased directly from Edison. During the original construction of the Renaissance Center, RCV's predecessor, RCP, installed and maintained transformers to reduce the electricity so that it could purchase electricity at the primary rate to provide to tenants.

Under the Edison contract, RCV had the option to charge tenants a set amount for their electricity as part of its lease agreements with tenants, or to "resell" the electricity and thereby charge tenants for their usage of the electricity. If RCV chooses to resell the electricity, it must secure authority to do so from Edison according to "Standard Rider No. 4, Resale of Service." Under Rider No. 4, Edison requires that when electricity is resold, each tenant's usage must be separately metered and the tenant can be charged no higher or lower rate than if the tenant had purchased the electricity directly from Edison. That is, RCV must resell the electricity at the secondary rate. Rider No.

4 states that the owner or operator of an office building may:

> purchase electricity from the company for resale to the tenants of the building on condition that services to each tenant shall be separately metered, and that the tenants shall be charged for such service at the current rate of the company for similar service under like conditions.

The RICO plaintiffs argue that the manner in which RCV meters electric usage does not constitute separate metering under Rider No. 4. However, when plaintiffs' counsel made identical complaints directly to Edison in 1992, Edison investigated the situation and determined that RCV was not in violation of the Edison contract or Rider No. 4. More recently, on January 5, 1995, Edison again addressed the issue and concluded that RCV has never been and is not now in violation of the provision of the Edison contract or Michigan Public Service Commission (MPSC) Rules. The Director of Central Contracting for Detroit Edison assigned to manage the Renaissance Center (RCV) account for Detroit Edison submitted an affidavit unequivocally stating, "RCV is not required to install individual meters for each tenant," and "it is the position of Detroit Edison that RCV has not been in violation of the provisions of either the Agreement or the MPSC Rules."

The RICO plaintiffs also contend that RCV's method of metering the electric usage of its office tenants violates the terms of their lease agreements with RCV. All leases written by RCP/RCV from 1977 to the present contained a substantially similar proviso regarding the calculation of electric rates. The lease provisions at issue are Section 16.1 of the Quality lease and section 5(b) of the ROM lease. The Quality lease at Section 16.1 provides:

> 16. Electricity
>
> 16.1. Landlord will furnish electricity to the Demised Premises, and Landlord shall elect either: (i) to charge Tenant for electricity as determined by metering, (the cost of which is to be paid by Landlord) at the applicable secondary rates filed by Landlord with the proper regulating authorities then in effect from time to time covering such services, but not more than

the secondary rates which would be charged to Tenant by the public utility company; or (ii) to charge Tenant for electricity based upon engineering surveys of the Demised Premises, including periodic spot check demand and/or consumption metering by Landlord, at Landlord's expense. Engineering surveys shall be performed by independent licensed professional electrical engineering consultants. From time to time during the term of this Lease, Landlord may inspect the Demised Premises in order to evaluate Tenant's kilowatt hours electric consumption and demand, and if as a result of such inspection the amount charged to Tenant shall change because of changes in demand and/or consumption, or in the cost of electricity to Landlord, Landlord shall notify Tenant in writing and commencing with the first day of the next calendar month, Tenant shall pay such revised charge. See Section 16.1(a) of the Attached Rider.

Similarly, Section 5(b) of the ROM lease provides:

(b) Landlord will arrange for the furnishing of electricity to the Premises, and Landlord shall elect either: (i) to charge Tenant for electricity as determined by metering at the applicable secondary rates filed by Landlord with the proper regulating authorities in effect from time to time covering such services, but not more than the secondary rates which would be charged to tenant by the public utility company; or (ii) to charge Tenant for electricity based upon engineering surveys of the Premises, including periodic spot check demand and/or consumption metering by Landlord, at Landlord's expense. Engineering surveys shall be performed by independent licensed professional electrical engineering consultants selected by Landlord. From time to time during the term of this Lease, Landlord may inspect the Premises in order to evaluate Tenant's kilowatt hour electric consumption and demand, and if as a result of such inspection, the amount charged to Tenant shall change because of changes in demand and/or consumption, or in the cost of electricity to Landlord, Landlord shall notify Tenant and commencing with the first day of the next calendar month, Tenant shall pay such revised charge in monthly installments on the first day of each month. Notwithstanding anything herein contained to the contrary, Landlord reserves the right to terminate the furnishing of electricity at any time upon thirty (30) days notice to Tenant, in which event Tenant shall make application directly to the utility company servicing the Phase I Complex for Tenant's separate supply of electric current, and Landlord shall permit its wires and conduits to be used for such purposes, to the extent available and capable of being used safely.

The RICO plaintiffs contend that the terms of the lease were violated because their offices were not separately metered to determine their electric usage nor was an engineering survey conducted. Although it is clear that the lease does not require separate metering for each office, the RICO plaintiffs claim that Rider 4 is incorporated by reference into the lease agreement and that Rider 4 required separate meters for each office. Again, the RICO defendants refute these allegations.

RICO plaintiffs further argue that the electric statements provided to them were fraudulent because they do not state that RCV was a reseller of electricity, that common areas were included in the percentage calculations, that RCV was charging the secondary rate without separate metering or that it was allegedly keeping a portion of the Detroit Utility Users Tax that it collected.

### G. *Utility Taxes*

RICO plaintiffs claim RCV improperly charged them Detroit City utility taxes and Michigan State taxes on the electricity at the secondary rate rather than the primary rate. Furthermore, they contend that RCV remitted utility tax payments to the City of Detroit at the lower primary rate instead of the higher secondary rate charged, and pocketed the difference. RCV responds that it has properly paid its taxes and furthermore, that RICO plaintiffs lack standing to challenge whether RCV properly paid its taxes. RCV maintains that plaintiff filed complaints that it was not paying taxes with authorities over

two years ago and yet, no taxing authority has notified RCV that it owes any additional taxes. RCV also states that its taxes are audited annually by Coopers & Lybrand.

Moreover, RCV maintains that RICO plaintiffs lack standing because a tax offense is a public harm, not a personal cause of action. *Alexander v. Norton Shores,* 106 Mich.App. 287, 307 N.W.2d 476 (1981). RCV contends that plaintiffs must show a substantial loss or damage as a result of its alleged failure to pay the appropriate amount of Detroit utility taxes. Plaintiffs have not done so. Even if plaintiffs' allegation is true that RCV charged utility taxes based on the secondary rate but remitted them based on the primary rate, the cause of action for such underpayment of taxes would rest with the City, not plaintiffs. Thus, plaintiffs lack standing to challenge the alleged underpayment of taxes by RCV.

### H. *RICO Claims*

In both cases, the RICO plaintiffs allege that defendants are liable under civil RICO for allegedly mailing false electric bills. They allege the RICO defendants committed the predicate acts of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and extortion under color of law pursuant to 18 U.S.C. § 1951.

In both the *Quality* and *RCV* actions assigned here, multiple motions for summary judgment and partial summary judgment are pending raising myriad issues and addressing both the state law and federal RICO claims. Upon considering these motions, it became apparent to the court that there was a serious question as to whether any valid RICO claims existed under the facts of these cases. Because jurisdiction is premised solely on the alleged RICO claims, the court determined that it would be in the interests of judicial economy to narrow the multiple issues raised in the various motions down to the RICO claims only. Thus, the court held a status conference on February 1, 1995, and ordered the RICO plaintiffs to show cause why their RICO claims should not be dismissed. The court allowed the RICO plaintiffs to complete the discovery they alleged was necessary to respond to the court's concerns. The court allowed this additional discovery despite the fact that the *Quality* case has been pending for almost two years and substantial discovery, including nine depositions, had already occurred. Upon completing the additional depositions and discovery alleged to be necessary, the RICO plaintiffs complied with the court's show cause order. The RICO defendants filed timely responses seeking summary judgment in their favor as to the RICO claims. The RICO plaintiffs filed timely reply briefs. Having carefully reviewed these pleadings, the court finds that the RICO plaintiffs have failed to offer any factual or legal support for their RICO claims. Thus, summary judgment must be granted in favor of the RICO defendants as to the RICO claims.

### STANDARD FOR SUMMARY JUDGMENT

The parties agree that the appropriate standard for determining whether plaintiffs' RICO claims survive is the standard for summary judgment. In fact, in response to the court's show cause order, the RICO defendants seek summary judgment in their favor as to the RICO claims. Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

"[T]he standard for determining whether summary judgment is appropriate is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co. Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original).

The Sixth Circuit has held that trial courts considering a motion for summary judgment may not make findings of fact. The movant must conclusively show "that there exists no genuine issues as to a material fact and that the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980) (citations omitted). The substantive law governs the determination of which facts are material. "Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 1583, 20 L.Ed.2d 569 (1968). Mere allegations or denials in the non-movant's pleadings will not meet this burden. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The non-moving party to a summary judgment motion cannot rest on its pleadings to avoid summary judgment. It must support its claim with some probative evidence. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

## DISCUSSION

### A. *Damages*

The court first considers whether the RICO plaintiffs are the proper parties to bring a civil RICO action pursuant to § 1964 which authorizes a private suit by "[a]ny person injured in his business or property by reason of a violation of § 1962." In *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), the Supreme Court explained that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." RICO plaintiffs allege that they were injured by improper metering which resulted in overbilling. RICO defendants respond that office tenants were not improperly metered or overbilled. They explain that despite the filing of formal complaints by some plaintiffs, Detroit Edison, Michigan Public Service Commission (MPSC), and the City of Detroit have concluded that tenants were properly billed for electricity in compliance with Michigan law and the Edison contract. RCV charged tenants for electricity at the secondary rate, the exact same rate which would have applied had the tenants purchased their electricity from Edison directly.

The RICO plaintiffs have failed to submit any proof that they were overbilled for their electric usage. Instead, plaintiffs are suing for a mere technical violation of RCV's agreement with Detroit Edison that it would separately meter tenants for which it charged the secondary electric rates. Plaintiffs contend that RCV was barred from purchasing electricity from Edison and reselling it to Renaissance Center tenants at the secondary rate unless RCV separately metered each office. Even if RCV's metering method does violate its agreement with Edison, which Edison maintains it does not, the RICO plaintiffs have failed to show how this technical violation caused them economic harm.

It is unclear why the metering system which is in place would cause overbilling. In fact, RCV's engineering consultants concluded that providing a separate meter for each tenant, as plaintiffs allege should have occurred, would have resulted in higher monthly charges to tenants. In addition to a

monthly meter reading charge, the tenant would incur rewiring costs whenever it moved from its space to another within the Renaissance Center and whenever it changed the size of its office space.

At one point, Quality claimed that the lack of separate meters may have caused an over-allocation of electricity to it and thus resulted in higher bills. Because Quality purports to represent a class of office tenants, however, if the meter system in place caused an over-allocation of electricity to one member of the class, then concomitantly, it must have caused an under-allocation of electricity to another member of the class. Taken as a whole, there would be no economic injury to the class. Perhaps for this reason, Quality has abandoned the position that electricity was misallocated (See Reply Brief in Support of Class Certification Motion filed Feb. 27, 1995, at 3).

Plaintiffs have merely made conclusory allegations that they were overbilled but offer no proof in support of their claims. Under these circumstances, the court finds that even if RCV used a metering system different than the one called for in its agreement with Detroit Edison, plaintiffs have not shown that this conduct caused them to suffer any economic injury. Thus, the RICO plaintiffs lack standing to proceed with their RICO claims and those claims must be dismissed.

### B. *Predicate Racketeering Acts*

■ Although the RICO plaintiffs lack standing to proceed with their RICO claims, even if the court were to find that plaintiffs had standing to sue, summary judgment must enter for defendants as to the RICO claims. The RICO plaintiffs pled violations of RICO pursuant to 18 U.S.C. § 1962(c). To prove a RICO claim under § 1962(c), plaintiffs must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). "Racketeering activity" is defined in 18 U.S.C. § 1961(1)(B) as including any indictable act under certain enumerated statutes. Unless the alleged fraudulent overbilling complained of by plain-

tiffs in this case falls within the limited list of "racketeering activities" set forth under § 1961, they cannot be used as "predicate acts" for purposes of establishing a legally cognizable RICO violation.

■ In the instant case, the RICO plaintiffs argue that the alleged overbilling constitutes the predicate acts of mail fraud pursuant to 18 U.S.C. § 1341 and wire fraud pursuant to 18 U.S.C. § 1343. They had also argued that the alleged conduct constituted extortion pursuant to 18 U.S.C. § 1951. However, in their response to the court's show cause order, plaintiffs do not discuss § 1951, apparently conceding that there is no factual basis for such a claim. Indeed, § 1951 cannot establish a predicate act of racketeering in these cases because only public officials may be indicted for extortion under § 1951 and none of the defendants in these lawsuits are public officials. *See United States v. Shelton*, 573 F.2d 917, 921 (6th Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978); *United States v. Butler*, 618 F.2d 411 (6th Cir.1980). Thus, the court will limit its discussion to the allegations of mail and wire fraud.

■ To prove mail fraud, it is necessary to show (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud. *Central Distribs. of Beer v. Conn*, 5 F.3d 181 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2678, 129 L.Ed.2d 812 (1994). Similarly, the elements of wire fraud are (1) the formation of a use of the United States wires in furtherance of the scheme (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud. *Id.*

■ In these cases, the RICO plaintiffs have come forward with no evidence to support their allegations that the RICO defendants formed a scheme to defraud. There can be no mail or wire fraud where there is no misrepresentation or omission. The RICO plaintiffs assert that defendants de-

frauded them by failing to disclose that they were allegedly required to install separate meters for each individual tenant. They argue this requirement arises from the terms of their lease agreements regarding electric billing. The lease agreement contains no such requirement. It merely provides that the Landlord will determine electric bills by "metering." Plaintiffs argue that the separate metering requirement should be read into the lease because RCV's contract with Edison required that each office be separately metered. The RICO defendants respond that they do not interpret either contract, that is the tenants' lease agreements or RCV's contract with Edison, to require that each office be individually metered. They argue that the parties' contractual dispute over which type of metering was actually required does not give rise to a RICO cause of action but at most, to a breach of contract claim. *See Central Distribs. of Beer,* 5 F.3d at 184.

The RICO defendants did not misrepresent or omit any material facts from the monthly billing statements. The electric statements clearly explained how the rates were calculated. They informed tenants that offices shared meters; thus, there was nothing deceptive about the fact that the invoices did not also state that separate metering did not occur. Such a statement would have been duplicative. The RICO plaintiffs also argue that the statements should have said that separate metering was required. The parties have a contractual disagreement over whether RCV was required to separately meter each office. Under these circumstances, the fact that the billing statements did not state that the offices were not separately metered was in no way fraudulent.

**C.** *Intentional Scheme to Deceive or Defraud*

■ Even if plaintiffs' interpretation of the lease is proper, plaintiffs have failed to introduce any evidence that defendants' differing interpretation of the lease constitutes an intentional scheme to defraud. The law is clear that to support a claim for mail or wire fraud, there must be a specific intent to deceive or defraud. *Id.* The Sixth Circuit

has stressed that in order to show a RICO violation, a plaintiff must prove a scheme to defraud involving "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes. the designed end." *Dana Corp. v. Blue Cross & Blue Shield Mutual,* 900 F.2d 882, 885 (6th Cir.1990).

In the instant case, plaintiffs have presented no evidence of intentional fraud. Defendants charged electric rates based on metering and allocating charges by square footage. These calculations were performed by an engineering firm, Moylan, and those charges were audited by RCV's auditors, including Coopers & Lybrand. Nothing suggests that this method of determining electric rates was fraudulent. In fact, Edison has repeatedly approved of the method of calculating electric rates and has stated by way of affidavit that RCV was in compliance with its contract with Edison. Simply put, there is no cognizable RICO claim presented in this case.

**D.** *Contract Dispute Only*

The RICO plaintiffs have incorrectly cited several cases which they contend support their argument that a valid RICO claim exists in this breach of contract lawsuit.

The first case plaintiffs cite in support of their alleged RICO claim is *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In *Sedima,* the Court held that a prior criminal conviction is not a prerequisite for the filing of a RICO action and further held that RICO does not require a "racketeering injury," that is, an injury caused by an activity that RICO was designed to deter. *Id.* at 524, 105 S.Ct. at 3287. In reaching that holding, the Court explained that RICO was broadly drafted and its enforcement was not limited to use against mobsters and organized criminals, but applied against legitimate businesses as well. *Id.* at 499, 105 S.Ct. at 3286. *Sedima* did not address whether defendants committed the alleged predicate acts of mail and wire fraud.

*Sedima* offers no support to plaintiffs' position in this case. Defendants have not argued that RICO cannot be used against them because they are legitimate businesses

but, instead, because they did not commit the alleged predicate acts of racketeering. In fact, despite significant discovery, plaintiffs have come forward with no evidence to support their allegations that defendants committed the predicate acts of mail and wire fraud. Plaintiffs have not presented any evidence that they were overbilled for electricity. They have not shown that they would have been charged less if their offices were separately metered or that the metering system used resulted in overbilling.

Similarly, plaintiffs also cite *American Nat'l Bank & Trust Co. of Chicago v. Haroco, Inc.,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), in support of their RICO claims. In that case, the Court was presented with an alleged RICO violation where a bank fraudulently charged excessive interest rates on loans. The predicate offense alleged was mail fraud. The district court dismissed on the grounds that the injury did not stem from the RICO violation, and the Seventh Circuit reversed, ruling that RICO did not require a distinct RICO injury. The Supreme Court affirmed. Plaintiffs argue this case supports their claim that billing fraud is actionable under RICO. To the contrary, *Haroco* does not support plaintiffs' position because the instant case involves no fraudulent conduct.

■ Plaintiffs are correct that billing fraud may give rise to a RICO claim where the fraudulent scheme is perpetrated through the predicate racketeering act of mail or wire fraud. *See In re Long Distance Telecommunications Litigation,* 831 F.2d 627 (6th Cir.1987); *United States v. Talbott,* 590 F.2d 192 (6th Cir.1978); *United States v. Lebovitz,* 669 F.2d 894 (3rd Cir.); *cert. denied,* 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). All of the above-cited cases involved actual fraud, and thus, are distinguishable from the case now under consideration. None of the above-cited cases involved differing contract interpretations but rather intentional acts of deception. In this case, there is simply no evidence that any overcharging occurred. The dispute centers upon whether plaintiff-tenants' leases required that each individual office have its own electric meter or whether electric rates could be calculated by an independent engineering firm which used meters on each floor and allocated electric usage according to the square footage of each office. This dispute is properly characterized as a disagreement over contract interpretation. There is no evidence that defendants had any intent to defraud.

The facts of this case are similar to the facts pled in *Blount Financial Servs. v. Walter E. Heller & Co.,* 819 F.2d 151 (6th Cir. 1987), in which the Sixth Circuit held that no cognizable RICO claim existed. In that case, plaintiff sued for RICO violations when he was forced out of business because defendant charged a rate of interest which plaintiff alleged was illegal under their contract. The contract required that the prime rate be determined based on adjusting upward the rate that the Continental Illinois Bank charged its most credit worthy customers. Plaintiff alleged that defendant knew that the bank charged a lower than advertised prime rate to its best borrowers but concealed that fact from plaintiff. The court held that even if those allegations were true, plaintiff could not prove a scheme to defraud existed, which is an element of mail fraud, because a scheme to defraud requires proof of misrepresentations or omissions which were "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* at 153. The court determined that plaintiff was in as good a position as defendant to determine the bank's prime rate, and thus, defendant could not be liable for mail fraud, and no RICO violation existed. The court further noted that under the business circumstances presented, the only claim plaintiff had was at most a breach of contract action. *Id.*

■ Similarly, in the instant lawsuit, there is no cognizable RICO claim. In order to establish mail or wire fraud, plaintiffs must prove misrepresentations or omissions were made which were "reasonably calculated to deceive persons of ordinary prudence and comprehension." Plaintiffs have failed to do so. They allege that defendants defrauded them by calculating their electric bills in violation of the lease agreements. Plaintiffs claim that the electric bills were

fraudulent because they failed to state that the offices were not separately metered and that no engineering studies of electricity had been made. This information was not withheld or misrepresented from plaintiffs. Plaintiffs could have called Detroit Edison and learned about metering and rates. Furthermore, Detroit Edison's rates are a matter of public record.

The electric statements disclosed how electric rates were determined. The statements provide detailed information regarding the electric charges, including the tenant's name, number and identification of the meters serving the tenant, the number of tenants on each meter, the percentage that each tenant paid of the total amount of electricity consumed on the particular floor, the meter readings, and the service rate charged. There were no misrepresentations or omissions in the electric statements. Those statements were calculated and prepared by an independent engineering firm; the calculations were audited annually by Coopers & Lybrand. Notwithstanding formal complaints, the MPSC, Detroit Edison and the City of Detroit have concluded that plaintiffs properly billed tenants in compliance with Michigan law and the Edison contract. The gravamen of plaintiffs' complaint is that electric rates were not computed as allegedly required by the lease agreement. This charge does not state a fraud claim. Plaintiffs' allegations state at most, a breach of contract claim and do not give rise to a RICO action.

E. *Passive Investors*

 An additional reason exists for granting summary judgment in favor of some RICO defendants named in the two complaints. The Supreme Court recently held that in order to be found liable under civil RICO pursuant to 18 U.S.C. § 1962(c), a defendant must have some degree of direction or management of the operation. *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). Thus, passive financing arrangements are in-

sufficient to give rise to liability. Because defendants/third-party defendants THACE and its equity partners and Moylan did not manage or direct the enterprise, they may not be liable under RICO.

### CONCLUSION

For the reasons stated above,

IT IS ORDERED that Case No. 94–CV–74485–DT is hereby dismissed as having been improperly removed.[4]

IT IS FURTHER ORDERED that summary judgment enter in favor of defendants in Case No. 93–CV–72629–DT and in favor of counter-defendants and third-party defendants in Case No. 94–CV–74841–DT as to the RICO claims only.

IT IS FURTHER ORDERED that the supplemental state law claims in Case No. 93–CV–72629–DT and Case No. 94–CV–74841–DT hereby are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367 and *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

---

**4.** Remand is not appropriate because the case was subsequently removed properly by third-par-

ty defendants.